May it please the Court, I'm Judith Wood and I'm representing Mr. Jang. It seems to me, Your Honors, that the issue in this case is very straightforward. It's the tension between the interpretation of the North Korean Human Rights Act as enacted in 2004 and then 2008 and 2012 and the board's holding in KRY. Counsel, in this case, let's suppose that your client, instead of going to South Korea, had gone to South Africa and he had been there for four and a half years, gotten educated, gotten a job, gotten a passport. Would he be firmly resettled in South Africa? Yes. So what text in the statute, the North Korean Human Rights Act statute, in your mind, affects at all the decision about firm resettlement, which does not require nationality. It's just about whether you have found a new home where you're not persecuted. What text do you rely on in the statute? I'm looking at Section 302 of the North Korean Human Rights Act, which says, the purpose of this section is to clarify that North Koreans are not barred from eligibility for refugee status or asylum in the United States on account of any legal right to citizenship they may enjoy under the Constitution of the Republic of Korea. It is not intended in any way to prejudice whatever rights to citizenship North Koreans may enjoy under the Constitution of the Republic of Korea, or to apply to former North Korean nationals who have availed themselves of these rights. That's the issue. Let me ask a question. How does that trump the fact that it's clear that Mr. Jang did resettle in South Korea. He ultimately got his passport. He was able to travel and enjoy some of the other benefits of being a South Korean citizen. So how does what you've just read trump what otherwise appears to be substantial evidence that he had in fact resettled in South Korea before he came to this country? Well, the immigration judge himself found. I'm sorry? In fact, the immigration judge found at the beginning of the hearing that the interpretation of the North Korean Human Rights Act was that it did not preclude those North Koreans who settled in South Korea from asylum. We have de novo review, though, of that legal conclusion. That's a statutory interpretation. He made that statement before the passage of KRY, when the beginning of the hearing. Right. But my point being that regardless of what the IJ thought the statute meant, it's up to us to determine now what we think the statute means. Well, what we're talking about is actually the spirit of this law. Counsel, this is Judge Gould. If I could interject, please, before you go too deeply into the spirit of the law. Because I feel like the argument's a little bit off trail from the way I'm looking. The way I'm as one judge looking at this. So it seems to me that if someone's firmly resettled in South Korea, then the statute doesn't really have that much to say in my thinking. And the more important question is, in terms of circuit law and law of other circuits, what does it mean to be firmly resettled? And what is the significance of travel restrictions? So that if when your client went to South Korea, he was for years not allowed to travel, couldn't leave the country, didn't have a passport, what does that say about whether he was firmly resettled? And also, does it matter what's the significance of his belatedly getting the passport? Well, he wasn't given a passport for several years because his residency in South Korea was restricted. Not only that, but he tried to come to the United States before. Generally, North Korean refugees were not allowed to apply for refugee status in any other place than South Korea. In fact, if they went to embassies, U.S. embassies or other embassies in other countries, they were either returned to North Korea or directed somehow to the South Korean embassies. So they weren't really given a choice in the matter. Neither was Mr. Jang. And he remained in South Korea as a consequence of his flight from North Korea. His intention was always to come to the United States, but he wasn't able to make that voyage until he obtained a passport. But in terms of the question that Judge Gould was asking you, the fact that he had earlier been subject to restrictions, what difference does that make? Because the question of firm resettlement looks at where he was ultimately. He was never harmed in South Korea, and ultimately he was able to be educated, get work, get a passport. And as I understand your brief, you have not raised the issue that previous restrictions mean that he can't be firmly resettled. You've relied, as I understand it, only on the statute. Is that correct, understanding of your argument? Well, what I'm trying to say is that under ACFR 1208.15, there's an exception to firm resettlement. A person is not firmly resettlement. If entry into another country or status in another country was a necessary consequence of flight from persecution. That's what the statute says. So he had to go to South Korea. There was no choice. It was a necessary consequence because he could not be accepted in any other country. And all the legislative history, starting with 2004, 2008, and 2012, says the United States is very concerned about North Korean refugees and North Korean asylum seekers. And the United States is further troubled by the lack of access afforded to the United Nations High Commission on Refugees to North Koreans. That's the problem throughout. Plus, when you get to another country, you're not allowed to go, if you're a North Korean refugee, to any other embassy. And in China, you're not allowed even to have any kind of interview. You're just repatriated to North Korea where you face certain death. So the only door open to these people was South Korea. And the whole idea of this. I'm not sure why that matters. If, in fact, people are firmly resettled and have made a life in South Korea, I don't see in the text of this statute any indication that it is not possible for someone to firmly resettle in South Korea. The operative section, which is section B, seems to be aimed at the problem of considering someone a dual national of North and South Korea. Because if you are a dual national and you're seeking asylum here, you have to prove that both of your countries persecute you. And South Korea didn't persecute people in general. Isn't that the sole purpose of this statute, is to make people single nationals for purposes of understanding their previous persecution? Well, Your Honor, with all due respect, the South Korean constitution regards anybody living on the peninsula, the Korean peninsula, as a citizen of South Korea. Yes, and that is the only problem, in my view, that this statute is designed to deal with, is to say, well, that makes it hard for someone from North Korea to ever get asylum because if they're considered a national of South Korea, even if they never set foot there, they can't prove they were persecuted there. So in order to prevent that bar, the statute says, well, you're only going to be a national of North Korea. If you've been persecuted there, you can still seek asylum. Isn't that the only point of this statute? Would you repeat that? Just the last phrase. Yeah, well, I can't remember exactly how I put it. I follow your idea, though. I can respond. Okay. Let me give you an example. The KRY decision uses the word availed. That implies some kind of conscious action on the part of the refugee in South Korea. In fact, there is no conscious action. The routine is this. They get to South Korea. They're put in a place called Hanawon, where they're very restricted. It's basically a re-education camp. They're not allowed to go out. They get out after a few months, et cetera. But they never apply for citizenship in South Korea. As you know, in the United States, it's quite a rigorous routine and can be denied at the last moment because of all kinds of reasons. These people never apply, never have a test. Nothing happens. They're considered citizens before they even enter. So availed, the word availed, it's not a passive. I think we're talking across purposes. I guess it seems to me that there is a very narrow point to this statute, which is to allow someone to seek asylum as if they are only a national of North Korea. We ignore South Korea in terms of being a national. But my problem, following your argument, is that it does not appear to me that the question of firm resettlement relies in any way on being a national. To go back to my example, the person may be firmly resettled in South Africa but not be a national of South Africa. And so it seems to me that this statute is just irrelevant to the situation here. Of course, I follow your idea, Your Honor, regarding firm resettlement. But it really doesn't apply to North Korean refugees because they – Is it your position that no North Korean refugee can ever firmly resettle in South Korea, period, no matter how long they stay or how wonderful their life there? They haven't firmly resettled because they were already – Answer no question. It is my contention that they haven't firmly resettled because they were – they're not resettled. They were already considered South Korean citizens before they got here. So if a North Korean goes to South Korea and is there for 25 years, has a family, is, you know, one of the wealthiest people in the country, has a passport, has been educated there, they are not firmly resettled in South Korea. It won't become an issue because he won't apply for asylum in the United States. You're evading my question, which, you know, which is you're – certainly you can do that, but it just doesn't – it would have to follow from your argument that in my hypothetical that person also is not firmly resettled. Well, I mean, you're raising an interesting situation, but it's not the fact pattern that we're dealing with because these people who come to the United States, including Mr. Jang, have not – do not consider themselves to have firmly resettled in South Korea because they never wanted to be there in the first place. Is that the statutory or regulatory test, whether they consider themselves firmly resettled? So if someone says, well, I know I've been there 25 years, but I don't consider myself firmly resettled, is that dispositive? Well, in this case, he wasn't there 25 years, and as soon as he got a passport, he left. Okay. You don't have to answer my question, but does it matter whether a person themselves consider themselves to be firmly resettled? I think it would matter, yes. But I think this case can be distinguished from the fact pattern which you've raised. Counsel, could I interject a question to just see if I can have you focus on basically the same concern I think Judge Graber's question's raised, but from a slightly different angle. What is the purpose of firms' resettlement doctrine in asylum law? Why do we care if someone's firmly resettled? Why does it affect their ability to get asylum? The philosophy behind the law is that if someone has a safe place to live and they don't fear persecution and they have not been persecuted in that place, then the statute as far as asylum doesn't apply to that person, because an asylee is a person who fears persecution. Okay, so let me accept that. So accepting the premise of what you just said, why isn't a person in Judge Graber's hypothetical, who's lived for 25 years in North Korea or some long period, South Korea, as well established there, why can't they be considered firmly resettled? Because there's not a resettlement in the North Korean, South Korean peninsula. The South Korean government considers them citizens before they even arrive. Okay, so you're saying they're settled in South Korea from the outset. Right, from birth. Okay, thank you. You're almost out of time, but we've used an awful lot of it with questions, so when the time comes, you may have three minutes for rebuttal. Okay, I'll reserve a few minutes for rebuttal. Well, you don't have any, but three should do it, I think, when you come back. Thank you. Thank you. We'll hear from the government. Good morning, Your Honors, and may it please the Court, Alexander Lutz for the Attorney General. Your Honors, this case raises a question of pure statutory construction, and it's important at the outset to recall the objective of statutory construction. The reason we're all here today is to determine what Congress's intent was in drafting and enacting a statute and give effect to that intent. It's not our job to reconcile U.S. statutes with foreign constitutions or to determine which interpretation of a statute would have the best practical effects for a particular petitioner. The question is only this. What did Congress intend to do when it enacted Section 302 of the North Korean Human Rights Act? And in this case, we can determine that purely on the basis of the statutory text, and we can determine specifically that, as Your Honors touched on in your questioning of counsel for petitioner, this statute has no bearing on the firm resettlement bar. Here's my question to you. Looking at the regulation on firm resettlement, I take counsel's argument to be that firm resettlement cannot apply because under the regulation, an alien is considered to be firmly resettled if, prior to arrival in the United States, he or she entered into another country under certain conditions. And I take part of her argument, at least, to be they're not entering another country because South Korea considers it all to be one country, so they can never be firmly resettled. What is your response to that? Well, I have a few points in response to that, Your Honor, and the first of them is that that issue has been waived before this Court. There were a number of different arguments that were raised before the agency, but in the petitioner's opening brief, the only issues that have been raised have to do with construction of Section 302 of the North Korean Human Rights Act and its applicability, if any, to the doctrine of firm resettlement. So I would respectfully submit first that the question of whether North Korea and South Korea are one or two different countries, which was raised before the agency, and the question of whether Mr. Jang did, in fact, firmly resettle in South Korea, which was raised before the agency, neither of those have been raised before this Court, and therefore they're both waived. Your Honor, I agree with your interpretation of Section 1208.15 of Title VIII of the Code of Federal Regulations, but I'm afraid I can't answer the question any farther than that simply because the issue hasn't been properly placed before the Court. Counsel, Judge Gould, if I could interject two questions for you, which were the same questions I asked your colleague on the other side. First of all, what is the purpose of firm resettlement doctrine as related to the asylum laws? Your Honor, I'm afraid that I'm not going to be able to give you a satisfactory answer to that question. I can direct the Court's attention to footnote 4 in its opinion in Abdil from 2001, which sets forth a very comprehensive history of the firm resettlement doctrine. Well, isn't opposing counsel's statement essentially correct, that the whole point of it is that you don't need asylum in the United States if you have found another country that is safe where you can live out your life? Isn't that more or less a correct statement? I believe it is, Your Honor. I think that makes a lot of sense. The only reason I'm hesitating in answering Judge Gould's question is because I'm not aware of what specifically was the intent when that was made part of United States law. I can't cite an authority for that, so I can't represent exactly what the intent was, but Your Honor's point is very well taken. Well, as a matter of logic and purpose, isn't opposing counsel correct in the general philosophy? Let me just make sure I understand which aspect of opposing counsel's argument you're referencing. Just the answer to Judge Gould's question, that you don't need asylum in the United States if you have settled in another place where all is well. Yes, Your Honor. As a matter of pure logic, I would agree. That is a purpose of the doctrine. Okay. Then, counsel, my second question related to travel restrictions. So what is the significance, if any, of travel restrictions on a person when they land in the new place and for whether they are firmly resettled? And if they had restrictions for some number of years, but at the end got a passport, does that have any significance? Your Honor, it may have some significance, but once again, I'm afraid I have to preface my answer by pointing out that the question of whether Mr. Jang did, in fact, firmly resettle in South Korea has not been raised in briefing before this Court, and therefore it's been waived. The only issue before the Court is interpreting Section 302 of the North Korean Human Rights Act and determining what, if any, application that statute has to the firm resettlement doctrine. But as an abstract matter, Your Honor, I can tell you that there is an exception to the firm resettlement bar that is in Title VIII, Section 1208.15 of the Code of Federal Regulations, and it states that if conditions of residence in the country where a petitioner may arguably have resettled are so substantially and consciously restricted that that person is not, in fact, resettled, that may create an exception to the doctrine of firm resettlement. But again, any argument that Mr. Jang fits within that exception while it was raised before the agency has not been raised before this Court and the Court's not called upon to decide it. I hope that was a satisfactory answer, Your Honor. But don't we have to look at resettlement and whether or not it occurred here or not? I mean, isn't that implicitly involved in issues we have to decide? Respectfully, Your Honor, I would suggest that it is not. I would argue that whether Mr. Jang firmly resettled in South Korea is one question, and whether Section 302 of the North Korean Human Rights Act was intended by Congress to create an exception to the firm resettlement bar for North Koreans who resettle in South Korea is a second question. So to put it another way, the first question is whether Mr. Jang fits the conventional test, and the second question, the only one put before this Court, is whether, irrespective of the first answer, there's an exception to having to fit that test at all for people in Mr. Jang's position. What are your answers to those questions? Sure, Your Honor. I'm sorry. I didn't mean to interrupt. Go ahead. Well, the first question is whether or not he firmly resettled, and my answer to that is respectfully that that question has been waived. It was raised before the Board, but it was not raised in briefing here. But I assume that your alternative argument would be, if we have jurisdiction over that question, that there is substantial evidence to support the agency's conclusion that he was firmly resettled because of the passport, the job, the college, the brother, the sister, et cetera. Your Honor is absolutely correct. There are multiple indicia of resettlement, and I believe at one point Mr. Jang conceded that he had what he termed indicia of resettlement. He was issued a passport. He was given a household register, a registration record, a registration ID card, pursuant to a special program designed to resettle North Korean refugees, a certificate of completion of a socialization program. He went to school. He held a steady job. His family moved there with him, and he resided there for four years. These are clearly indicia of firm resettlement. To return to Your Honor's question, the second point in my two-question analysis of this was whether the North Korean Human Rights Act, specifically Section 302, creates an exception for people in Mr. Jang's position such that we don't even need to ask whether they've been firmly resettled in South Korea. The answer to that question is emphatically no. It does not create such an exception. We can determine that here from the plain language of the statute. We don't even need to determine. We don't need to resort to extra textual sources. We don't need to determine the statute's ambiguous. The plain language of the statute shows us that Congress did not intend to create such an exception. Section 302A. Shouldn't we start with 302B, which is the operative language? Because a statute does whatever it does, and it's nice when Congress tells us what it had in mind, but don't we have to start with what it actually said it was doing, which is Section B? Your Honor, I'm happy to begin with Section 302B, but I just want to make sure I answer that question fully. It sounds like Your Honor is referencing an argument raised in the— No, I'm not referencing anybody's argument. I'm asking you whether if a statute says, here's our purpose, and then goes on and says, here's what we're doing, you know, thou shalt do X, thou shalt not do Y, that we start with the operative provisions, and if they're clear, we're done. If they're not clear, then we look back at the purpose to make sure that the interpretation of the operative sections accords with the purpose. I would agree with that. But don't we always have to start with the operative section of a statute as the place to begin? Because that's what Congress actually did, as opposed to telling you what it was thinking. Your Honor, I'm not aware of a case that specifically holds that, but that is a very sensible approach, to look first at what Congress said the statute would do, and secondly, to look beyond the operative sections at other parts of the statutory text that illuminate. In your view, what does subsection B, the operative section, accomplish? And how, if at all, does it relate to the doctrine of firm resettlement? Your Honor, I'd like to briefly preface my answer to that question, if I may, very briefly. We don't agree that there is a prefatory and an operative section between, a distinction as between section 302A and section 302B. They both carry a purpose. But 302A just says purpose. It's a purpose. And it says the purpose is. And then it says it's not intended to do this or that. So it's about what Congress was thinking. So would you answer my question about subsection B? What, in your view, is subsection B doing? What work does it do? And what relationship, if any, does that operative section have to the doctrine of firm resettlement? Absolutely, Your Honor. Section 302B has no effect on the doctrine of firm resettlement as it applies to people in Mr. Geng's position. Mr. Geng's argument is that it creates an exception, such that the firm resettlement analysis becomes an apposite for people in his position. That is not the effect of this language. It doesn't mention the firm resettlement bar. All it says. And the firm resettlement regulation doesn't mention nationality, correct? I don't believe that it does, Your Honor. It doesn't require that you be a national of the place where you firmly resettle. No, it doesn't, Your Honor. This court has held that the firm resettlement bar inquiry focuses on the existence, vel non, of an offer of some sort of permanent resident status or citizenship. These are separate inquiries. What Congress was looking at in section 302B is, as Your Honor identified earlier, the question of dual nationality. One arsenal, one weapon in our arsenal here of statutory construction is looking at the ordinary language, the ordinary meaning of words used in a statute. This court held that in U.S. v. Buckland. And if we look at the definition of national, we find that it means one who owes allegiance to or is under the protection of a nation. I'm citing there the 10th edition of Merriam-Webster's dictionary, but I'd point out that section 101A21 of the INA sets forth exactly the same definition. A national is a person owing permanent allegiance to a state. What section 302B does is it clarifies that a national of North Korea shall not be considered, per se, a national of South Korea. And this makes very clear sense, Your Honor, because it would be difficult, given the tensions between those two countries, to be a national of both of those countries, one who becomes a... And a North Korean who had never set foot in South Korea would face the problem of having to prove persecution in both places in order to... in the absence of this statute, would have to prove persecution in both countries in order to become eligible for asylum. Yes, Your Honor. And what this section... I'm sorry. So it sounds like you agree that the main, or perhaps the only purpose of this, is to allow a North Korean who makes their way to the United States who has not... who is not otherwise ineligible for refugee status doesn't have to prove that they've been persecuted in South Korea, too. Your Honors, if we expand the scope of our inquiry beyond the pure language of the statute and look at matter of KRY and the House of Representatives report that it cited, we can see exactly what the purpose of Congress was in enacting this provision. And it was to respond to an interpretation by the State Department, or to a policy of the State Department, that North Koreans, because they enjoyed an abstract perspective potential right to citizenship under the South Korean Constitution, were being treated from the very beginning as South Korean citizens and were being excluded from the United States asylum and refugee assistance programs. Congress specifically stated in this report that its intent was to side with the immigration courts and to push back against the State Department's presumption that because a North Korean could go to South Korea, they must be treated as a South Korean citizen for purposes of asylum. I hope that answers your question, Your Honor. That is the point that Congress was intending to reach. But in order to get to extra-textual sources like that, the Court would have to determine that the statute is ambiguous, which means that its plain language doesn't inform us as to what Congress's intent was. If we enter that sphere of statutory construction, we would submit that the Court should grant deference to the Board's decision in matter of KRY under the Chevron case, because what the Board has done there in matter of KRY is a very reasonable construction of what we argue is not an ambiguous, but of what the Court may hold to be an ambiguous statutory provision. But before we even get to questions of ambiguity, we would submit that this statute is very clear just based on its plain language. It doesn't mention the firm resettlement bar. It doesn't indicate any intent to a... Your Honor, I see I'm out of time. You may wrap up in a sentence or so. Thank you, Your Honor. Because the language of the statute is clear, both in its operative provisions and the provisions that set forth Congress's intent, and because that intent and those operative provisions do not relate to the firm resettlement bar, the petitioner's contentions must fail. We would respectfully submit that the Court should deny the petition for review. Thank you, counsel. Thank you. Ms. Wood, you have three minutes. Well, the section that you're talking about, Section 302B, says when applying for asylum under Section 208, a national of the Democratic People's Republic of Korea shall not be considered a national of the Republic of Korea. That language is pretty clear, meaning that a person from North Korea is not considered to be a citizen of the Republic of Korea. However, the Republic of Korea considers that person to be a citizen, and apparently the Board of Immigration Appeals considers that person to be a citizen of South Korea. So we have a basic conflict. Excuse me. In his testimony, Mr. Jang candidly acknowledged that, I don't fear going back to South Korea. I do not like it. In response to a follow-up question, he stated, I don't have a fear of returning to South Korea. I don't have fear, but I hate it. And so he was there long enough to develop no fear of persecution by South Korea, and some things happened to him we don't need to repeat in the interest of time. What is the significance of all of that for purposes of your argument? Well, I concede, Your Honor, that he said that he wasn't afraid. However, he suffered in South Korea. One of the consequences of him being in South Korea was that his brother in North Korea was executed. His brother was arrested and eventually executed. So even though he may not be personally afraid, the situation gave rise to persecution of family members in North Korea because of his presence in South Korea. And so that, according to case law, he's eligible for asylum simply because of that, because of his brother's execution based on his presence in South Korea. His presence in South Korea gives rise to a panoply of unforeseen consequences to his family members who remain to this day in North Korea. That is not an argument you made in your opening brief, is it, to us? It was mentioned, Your Honor. I had the same understanding as government counsel about the issue that you presented to us. That is, I understood the issue before us to be whether the statute prevents the operation of the firm resettlement doctrine in this situation. I did not understand you to say that if firm resettlement applies, he isn't really firmly resettled. Am I wrong? No, you're not wrong, Your Honor. It seems to me, however, that this statute, the North Korean human rights statute, which continually gets reinstated by Congress and, in fact, made more liberal, presents an issue which may not be exactly within your domain because it presents a human situation beyond the scope of what this Court has considered before, I think, and that is that these people who are fleeing North Korea and going to South Korea have no other open door to them. That's what the statute is concerned with, particularly if you read beyond Section 302. It's particularly concerned with the United States reaching out not only to North Korean refugees in North Korea but dealing diplomatically with other countries in the world and with South Korea and allowing it in the 2012 version of the statute. It talks about working it out with South Korea so that these people can have access to U.S. consulate. Heretofore, they have been restricted and only been allowed to go to South Korea. That's what this is about. That's what this whole thing is about. Can they go somewhere else besides South Korea? Thank you, Counsel. The case just argued is submitted, and we very much appreciate the excellent and helpful arguments from both counsel. With that, we stand adjourned.
judges: Graber, Gould, Daniel